IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

       Plaintiff,            CR No. 00-529-05-PA
                                       CV No. 04-225-PA

   v.

                                               **OPINION AND ORDER**

ALFREDO GONZALEZ-RODRIGUEZ,

       Defendant.
_____

**PANNER, J.**

     Defendant Alfredo Gonzalez-Rodriguez moves for relief under 28 U.S.C. § 2255.  I grant the motion.

                            **BACKGROUND**

**I.  The Charges Against Defendant**

     In October 2000, law enforcement officers executed a search warrant on rural property in Marion County, Oregon. Inside a barn on the property, officers found an active methamphetamine lab, with about 10 pounds of processed pseudoephedrine, gallons of denatured alcohol, iodine crystals, red phosphorus, and lye.

In a trailer on the property, officers found a large trash can containing white sludge and denatured alcohol, which appeared to be the first stage in the process of extracting pseudoephedrine from over-the-counter cold medications. Defendant and David Tovar were in the trailer, and a firearm was seized from the trailer's back bedroom.

Officers arrested Celio Saldivar-Esparza in a camper near the methamphetamine lab. Saldivar-Esparza, who wore clothes stained with pseudoephedrine, admitted that he was helping manufacture methamphetamine. He told law enforcement that defendant and Tovar lived on the property to provide security and were also involved in the manufacturing process.

No methamphetamine was found on the property. No methamphetamine was found on defendant's person when he was later arrested.

The government initially charged Saldivar-Esparza and two others with manufacture of methamphetamine. In December 2000, the government filed a superseding indictment charging defendant with manufacturing more than 500 grams of methamphetamine; conspiring to manufacture more than 500 grams of methamphetamine; being an illegal alien in possession of a firearm; and being an illegal drug user in possession of a firearm.

This court appointed Alan Gallagher, who understood Spanish, to represent defendant. Defendant was illiterate, did

not understand English, and had almost no experience with the criminal justice system.

Tovar was added as a defendant in January 2001. In April 2001, Tovar pleaded guilty to being an accessory after the fact and agreed to cooperate with the government in the prosecution of the other defendants, including defendant. Tovar's sentencing was continued until after defendant's trial.

## II. The Plea Offer

In June 2001, the government sent Gallagher a written plea offer. In exchange for defendant's guilty plea to accessory after the fact in the manufacture of methamphetamine, the government would move to dismiss the outstanding charges against defendant. The parties would agree to a base offense level of 30, based on 3.18 kilos of actual methamphetamine, and the government would recommend a 3-level reduction for acceptance of responsibility.

Gallagher advised defendant to accept the plea offer. Gallagher said defendant's sentence would be 70 months, based on the parties' assumption that defendant was in criminal history category I. The presentence report found that defendant was in criminal history category II, which would result in a range of

/ / / /

/ / / /

/ / / /

78-97 months when combined with a total offense level of 27.[1]

The government did not require defendant's cooperation as a condition of accepting the plea offer.  The offer provided  that because defendant "has not agreed to cooperate in the investigation and prosecution of others, the United States will not be moving for a downward departure under U.S.S.G. § 5K1.1 or Rule 35 of the Federal Rules of Criminal Procedure."  Def.'s Ex. 3, at 2.

Defendant states, however, "[Gallagher] told me that I would need to work for the government.  I thought he meant that I would be released and that I would be required to work undercover and identify drug dealers.  I didn't think that I could do that." Accepting defendant's statement as true, either Gallagher incorrectly described the plea offer or defendant misunderstood him.  Given defendant's lack of formal education and inexperience with the criminal justice system, it would not be surprising if defendant had misunderstood the terms of the plea offer.

/ / / /

/ / / /

/ / / /

/ / / /

---

[1] At sentencing, I departed downward in part because category II over-represented the seriousness of defendant's criminal history.

PAGE 4 - OPINION AND ORDER

**III. Trial and Sentencing**

    **A. De la Puente's Representation Before Trial**

Defendant did not hear from Gallagher again.[2] Because of Gallagher's failure to communicate with defendant, this court appointed Frank de la Puente to represent defendant.

When de la Puente took over defendant's representation in August 2001, the government's plea offer was open. De la Puente concluded that the government had a weak case against defendant on the two drug charges and advised defendant to reject the plea offer. In de la Puente's view, "the government wanted my client to plead to a 'potential amount' [of methamphetamine] which I thought the government could not prove at trial." De la Puente Decl. at 2. "The potential amount was based on the quantity of precursor ingredients and on the equipment for making meth which the government had seized." Id. De la Puente noted that no methamphetamine was seized from the lab site, and that defendant's fingerprints were not found on the lab equipment, although other defendants' fingerprints were identified.

De la Puente describes his advice to defendant about the plea offer:

> I told [defendant] about my assessment of the case. I also told him that, based on my analysis of the guidelines, and the fact that the authorities did not

---

[2] In 2004, the Oregon Supreme Court accepted Gallagher's "Form B" resignation, which avoided disbarment proceedings.

PAGE 5 - OPINION AND ORDER

> find any methamphetamine at the site, the most he
> could serve if convicted would be five years.  At one
> point before trial, I advised [defendant] that a
> sentence of 51 months was possible as illustrated in
> the attached table, which I used when advising
> [defendant].  Although I computed a worst-case
> scenario of 210 months, I would have advised that was
> highly unlikely.  My advice . . . regarding a likely
> sentence of 51 months would have been consistent with
> the positions I later took at the actual sentencing.
> I did not urge [defendant] to accept the offer of 70
> months before trial; I did advise him that I found it
> excessive and that his prior counsel's advise [sic]
> to accept the 70-month deal was wrong.  My general
> tone and advice to him was that he should go trial
> instead of accepting 70 months.

De la Puente Decl. at 2.  De la Puente showed defendant a chart illustrating two possible sentences.  If the amount of methamphetamine was 3.18 kilograms, as asserted by the government's expert, the chart indicated that the resulting sentence would be 210 months.  However, the "worst-case scenario" was off by more than 100 months.  The presentence report found that the applicable range was 324 to 405 months.  (I accepted the presentence report's calculations, although I departed downward to 169 months.)

De la Puente's chart indicated that if the relevant amount of methamphetamine was 90 grams, the sentence would be 51 months.  It is unclear how de la Puente arrived at 90 grams.  Defendant now speculates that it was based on the total amount of methamphetamine seized from other defendants.

/ / / /

PAGE 6 - OPINION AND ORDER

Consistent with de la Puente's declaration, defendant states that de la Puente told him that "I had a strong case and that I would win. He also told me that, even if I were found guilty, I would serve no more than a five year sentence." Defendant states that if he had known that he could have been sentenced to 169 months, he would have accepted the government's plea offer.

De la Puente made crucial, obvious errors in evaluating the strength of the government's case. A reasonably competent defense attorney would have known that even when no actual methamphetamine is found, the amount of methamphetamine may be estimated based on the lab's capacity. See, e.g., United States v. Williams, 989 F.2d 1061, 1072-74 (9th Cir. 1993) (approximating quantity of methamphetamine involved in conspiracy from capability of lab, including quantity of precursor chemicals). De la Puente assumed that defendant was unlikely to be held responsible for more than 90 grams, even though he had received the government's expert witness report, which concluded that the lab could have produced at least 3.18 kilograms of methamphetamine. De la Puente compounded this error by failing to seek expert advice on the lab's capacity. De la Puente states, "At no time did I attempt to consult with a forensic expert regarding the government's evidence of drug quantity, because I did not feel that such an expert's analysis was

PAGE 7 - OPINION AND ORDER

necessary." De la Puente Supp. Decl. Defendant submits the statement of Dr. Ray Grimsbo, who contends that the government's expert testimony on drug quantity was unreliable and lacked a proper foundation.

De la Puente also erred in failing to investigate the government's lay witnesses. A reasonably competent attorney, knowing that Tovar had pleaded guilty and agreed to cooperate with the government, would have realized that Tovar's testimony would be incriminating. De la Puente now states, "I should have retained an investigator to track down people like witness Julia Stone [Tovar's ex-girlfriend]. Had I spoken to Stone, I would have forcefully attempted to persuade my client to plead before trial." De la Puente Decl. at 3.

On September 26, 2001, about a month before trial, de la Puente met with the Assistant United States Attorney (AUSA) to discuss discovery and physical evidence. Two days later, the AUSA wrote de la Puente that the government had cooperating witnesses but had not yet obtained statements from them. Def.'s Ex. 5. At that point De la Puente should have been on notice that there were other possible witnesses against defendant.

On October 22, 2001, the day before trial, de la Puente received the government's reports on the statements of Julia Stone, Tovar, and Mario Garcia, the owner of the property. Tovar and Garcia had talked to investigators as part of their plea

PAGE 8 - OPINION AND ORDER

agreements.  Stone was not charged in this case, although she had a long history of arrests and an outstanding warrant for theft. See Def.'s Exs. 7 (Tovar), 8 (Garcia), and 9 (Stone).  The witnesses said that defendant managed the daily operations of the methamphetamine lab.  Defendant was described as frequently carrying a pistol in his belt, organizing the purchase of supplies, and being the "main dealer" for the finished product.

De la Puente states that when he received the witness statements,

> I became concerned that [defendant] would lose.  I attempted to work out a deal for [defendant].  By that time, the government had withdrawn its offer of 70 months.[3]  I tried to have my client plead guilty to the charge without admitting the drug quantity.  The government did not agree to my proposal.  In retrospect, I should have moved for a continuance to allow me more time to confer and counsel my client, and to negotiate with the government outside the confines of a courtroom as I was trying to do.

De la Puente Decl. at 2.  De la Puente did not immediately talk to defendant about accepting the plea offer, which was open until commencement of trial.  Commencement of trial generally occurs when the jury is selected.  See United States v. Elliot, 463 F.3d 858, 864 (9th Cir. 2006) ("In a jury trial, jeopardy attaches when the jury is empaneled and sworn.").  However, "once the

---

[3] De la Puente's first declaration was ambiguous on when plea offer was withdrawn.  His supplemental declaration clarifies, "The government's offer was still pending at the commencement of trial."

PAGE 9 - OPINION AND ORDER

trial starts, the deal's off." Govt.'s Ex. 6, at 10 (AUSA's statement at Feb. 2, 2009 hearing).

On the day before trial, de la Puente did arrange for defendant to plead guilty to being an illegal alien in possession of a firearm. In exchange for the guilty plea, the government dismissed the other firearm charge.

**B. Trial**

Trial began October 23, 2001. Defendant and Celio Saldivar-Esparza were the only defendants.

After the jury was selected, De la Puente moved to dismiss the case, or to exclude Tovar, Stone, and Garcia as witnesses, based on the government's failure to provide their statements until the day before trial.

The AUSA explained why the statements had not been disclosed sooner. I denied de la Puente's motion to dismiss or to exclude witnesses. I did order that the government not call the three witnesses until the second day of trial, which gave the defense an additional day to prepare for cross-examination.

After the first day of trial, de la Puente attempted to negotiate a plea in which defendant would plead guilty to one of the two drug charges but would not admit to the drug quantity involved. The government did not agree to the proposed terms.

At trial, Traci Rose, a forensic scientist with the Oregon State Police Forensic Laboratory, was the government's chief

PAGE 10 - OPINION AND ORDER

witness on drug quantity. Rose testified about the process for extracting pseudoephedrine. Tovar, Stone, and Garcia testified against defendant. Defendant testified, admitting to aiding in the manufacture of methamphetamine.

The jury found defendant guilty on both drug charges. The jury acquitted Celio Saldivar-Esparza.

After defendant's trial, Tovar received a sentence of 57 months. Defendant Juan Flores-Esparza pleaded guilty and also received a sentence of 57 months. Defendant Garcia, the property owner, pleaded guilty and received a sentence of 4 months. Defendant Jaime Lopez-Cruz, who was arrested after defendant's trial, pleaded guilty to the lesser charge of possession of chemicals used in making methamphetamine and was sentenced to probation with six months' home detention.

### C. Sentencing

At sentencing, I found that "defendant should receive a four-level downward departure based on a combination of circumstances, including defendant's minor criminal record; his limited role in the offense; his lengthy work record, showing that he has been a contributing member of this society; and his lack of any formal schooling. The downward departure is also justified to keep this sentence proportional to the sentences imposed on co-defendants." With the departures, the guideline range was 151-188 months. I sentenced defendant to 169 months.

De la Puente represented defendant on direct appeal. The Ninth Circuit affirmed. 63 Fed. Appx. 299 (9th Cir. 2003). The Ninth Circuit held that the record supported the presentence report's estimate of the drug quantity. The court also concluded that there was sufficient evidence that defendant's relevant conduct included the entire estimated amount of methamphetamine.

## STANDARDS

A prisoner serving a federal sentence "may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255. When there has been a "denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." Id.

## DISCUSSION

To establish ineffective assistance of counsel, a defendant must show that his lawyer's performance fell below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 668, 686-87 (1984). Courts must indulge a strong presumption that the lawyer's performance falls within the "wide range of reasonable professional assistance." Id. at 689. The defendant also must show prejudice by establishing "a reasonable probability that, but for counsel's unprofessional errors, the

PAGE 12 - OPINION AND ORDER

result of the proceeding would have been different."  Id. at 694.

### I. Advice on the Plea Offer

I agree with defendant that de la Puente provided ineffective assistance in advising defendant to reject the plea offer, and in failing either to seek acceptance of the plea offer or a continuance as soon as possible after receiving the statements for Tovar, Stone, and Garcia.

De la Puente's advice was fundamentally wrong about defendant's chances at trial and about the sentence defendant faced if convicted.  Although a defense attorney "cannot be required to accurately predict what the jury or court might find, . . . he can be required to give the defendant the tools he needs to make an intelligent decision."  Turner v. Calderon, 281 F.3d 851, 881 (9th Cir. 2002).  Here, de la Puente did not give defendant the information required to make an informed decision.  De la Puente told him that he would likely be acquitted.  A reasonably competent attorney, given the information available when de la Puente was appointed, would have recognized that defendant had very little chance of prevailing at trial.

De la Puente also advised defendant that even if convicted he would probably receive no more than a 60-month sentence.  However, a reasonably competent attorney would have realized that if defendant was convicted, he would probably be held responsible at sentencing for more than 3 kilograms of methamphetamine.

PAGE 13 - OPINION AND ORDER

Although De la Puente advised defendant of "a worst-case scenario of 210 months," he said such a sentence "was highly unlikely." In fact, defendant faced a sentencing range of 324 to 405 months. I conclude that De la Puente's advice was so incorrect and so insufficient that defendant was denied the right to make a reasonably informed decision about the plea offer. See id. at 880 (citing United States v. Day, 969 F.2d 39, 43 (3d. Cir. 1992)).

De la Puente was also ineffective in his representation of defendant after receiving the government's witness reports the day before trial. De la Puente finally realized that defendant was likely to be convicted, and with the plea offer still open, de la Puente had time to advise defendant to accept the government's offer, or at least to seek a continuance in light of the new evidence. Instead de la Puente chose to wait until after the jury was selected to seek dismissal or exclusion of the three witnesses. By then defendant had lost his chance to accept the plea offer. Defendant has established ineffective assistance of counsel based on de la Puente's advice to reject the plea offer, and on de la Puente's failure to act promptly to accept the plea offer the day before trial.

## II.  Other Claims

Defendant also argues that de la Puente was ineffective for failing to consult an expert or otherwise challenge the

PAGE 14 - OPINION AND ORDER

government's evidence on the drug quantity.  At trial, both de la Puente and Saldivar-Esparza's attorney cross-examined Rose on her method for calculating the lab's capacity.  Although de la Puente should have consulted an expert, defendant has not shown that this error by itself was ineffective assistance.

Defendant argues that de la Puente was ineffective for failing to prepare sufficiently for the cross-examination of Tovar, Stone, and Garcia, and for arguing, successfully but incorrectly, that the court, not the jury, should determine the quantity of drugs.  Defendant also claims that de la Puente should have argued that pseudoephedrine should not be treated as methamphetamine for sentencing purposes.

None of these claims shows ineffective assistance of counsel.  De la Puente's argument that the court should determine drug quantity benefitted defendant by effectively removing the otherwise mandatory minimum sentence of 120 months.

**III.  Remedy**

This court has discretion in creating a remedy.  "When ineffective assistance of counsel has deprived a defendant of a plea bargain, a court may choose to vacate the conviction and return the parties to the plea bargaining stage."  Riggs v. Fairman, 399 F.3d 1179, 1184 (9th Cir. 2005) (citing United States v. Gordon, 156 F.3d 376, 381-82 (2d Cir. 1998) (per curiam)).  "A court may also order the government to reinstate

PAGE 15 - OPINION AND ORDER

its original plea offer to the defendant or release the defendant within a reasonable amount of time." Id. (footnote and citation omitted). "In deciding the proper remedy, a court must consider the unique facts and circumstances of the particular case." Id. (citation omitted).

I accept defendant's statement that he would have accepted the government's plea offer if de la Puente had properly advised him of his chances of winning at trial and the likely sentence if he lost. I conclude that the appropriate remedy under these facts is specific performance of the plea offer. That results in a sentence of 78 months, which is the low end of the guideline range based on defendant's criminal history category and offense level.

Defendant has already served more than 78 months. He was sentenced in January 2002 after months in pretrial custody. Because defendant has completed the sentence that he would have received under the plea offer, the government must release defendant from custody within 30 days, subject to any outstanding detainers that may apply because of defendant's immigration status.

/ / / /

/ / / /

/ / / /

/ / / /

**CONCLUSION**

Defendant's amended motion to vacate or correct sentence (#257) is granted.  The government shall release defendant within 30 days.

IT IS SO ORDERED.

DATED this 31st day of March, 2009.

/s/ Owen M. Panner

--------------------------------
        OWEN M. PANNER
   United States District Judge

PAGE 17 - OPINION AND ORDER